433 So.2d 1109 (1983)
David JOHNSON and Earl Roberts, Individually and as the Administrator of the Estate of His Son, Ryan Roberts
v.
Alvin P. DUFRENE, State Farm Mutual Insurance Company and the City of New Orleans.
No. CA-0075.
Court of Appeal of Louisiana, Fourth Circuit.
May 20, 1983.
Rehearing Denied July 26, 1983.
*1111 William P. Schuler, Law Offices of Manuel A. Fernandez, Chalmette, for plaintiffs-appellees.
C. Gordon Johnson, Jr., Porteous, Toledano, Hainkel & Johnson, New Orleans, for State Farm Mut. Auto. Ins. Co.
Peter C. Rizzo, New Orleans, for defendants-appellants.
Avis Marie Russell, Asst. City Atty., George R. Simno, III, Deputy City Atty., Salvador Anzelmo, City Atty., New Orleans, for defendants-appellants and appellee.
Before AUGUSTINE, BARRY and KLEES, JJ.
AUGUSTINE, Judge.
This suit arises out of an automobile collision in Chalmette, Louisiana on July 2, 1978. Plaintiff David Johnson, heading west on St. Bernard Highway, had stopped for a red light at Paris Road. When the light changed in his favor, he remained stationary waiting for a turning vehicle to clear the intersection. At that moment, defendant Alvin Dufrene was also driving westerly on St. Bernard. He failed to detect soon enough that Johnson's vehicle was stopped dead on the road in front of him and, unable to control his car on the rain-slick highway, forcefully collided with Johnson from the rear, causing the injuries which are the basis of this litigation.
It was learned that at the time of the accident, Dufrene was an off-duty New Orleans policeman and that the automobile he was driving was owned by the City of New Orleans. Johnson and his guest passengers Earl Roberts and Ryan Roberts joined as plaintiffs in this action for negligence against Dufrene and his insurer, State Farm Mutual Automobile Insurance Company. The City of New Orleans was also named defendant, under the doctrine of respondeat superior.
Following trial on the merits, judgment was rendered in favor of plaintiffs David Johnson and Earl Roberts against Dufrene and the City. The trial court dismissed Ryan Roberts as a plaintiff and State Farm as a defendant. This appeal followed.
Dufrene's original negligence was not seriously contested at trial, and it presents no real dispute here. Rather, the dispositive issues now raised are:
1) Whether, at the time of the accident, Dufrene was acting within the course and scope of his employment as a police officer for the City of New Orleans, and
2) Whether the trial court erred in awarding $659,774.00 in general damages to Earl Roberts.

LIABILITY
The trial court held the City liable to plaintiffs under the doctrine of respondeat superior, finding that at the time of the accident, Dufrene was acting within the course and scope of his employment as a New Orleans police officer. That conclusion was based upon proof that Dufrene was driving an unmarked police car given to him in connection with his duties; that he had unrestricted permission to operate the vehicle as his own; and that Dufrene was "on call" when the accident occurred.
The City does not contest those facts, but argues that unless at the time of the collision, Dufrene was engaged in a function for which he was employed, there can be no vicarious liability on its part, and further, that merely operating a vehicle owned by one's employer does not impose vicarious liability on the employer where the employee's trip is a purely personal one. Keen v. Pel State Oil Co., Inc., 332 So.2d 286 (La. App. 2d Cir.1976). The City contends that Dufrene was engaged in a purely personal undertaking when he negligently collided with the plaintiffshaving just returned from his brother-in-law's birthday party, *1112 Dufrene was driving his mother-in-law to her New Orleans residence.
Article 2320 of the Louisiana Civil Code is the governing authority in this matter. It provides that:
"Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."
The language "in the exercise of the functions in which they are employed" is the Codal equivalent of the more common phrase "in the course and scope of employment." Romero v. Hogue, 77 So.2d 74 (La. App. 1st Cir.1954).
Whether an employee is within the course and scope of his employment during any given incident presents a question that is not answerable except by general rules, given the myriad contexts in which it might arise. The specific inquiry is whether the employee's tortious conduct "was so closely connected in time, place and causation to his employment duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interest". Daniels v. Conn., 382 So.2d 945 (La.1980); LeBrane v. Lewis, 292 So.2d 216 (La.1974). In those instances where the injury is caused by an employee's negligence while driving a vehicle owned by his employer, our jurisprudence has repeatedly stated that every case must be decided on its own facts. The important considerations which bear on the result are whether the vehicle was being used in such a manner as to benefit the employer, Taylor v. Lumpkin, 391 So.2d 74 (La.App. 4th Cir. 1980); whether the employee was subject to the employer's control at the time of the accident, Keen v. Pel State Oil Co., Inc., 332 So.2d 286 (La.App. 2d Cir.1976); whether the employee's use of the vehicle was authorized by the employer, Harding v. Christiana, 103 So.2d 301 (La.App. Orleans 1958); Futch v. W. Horace Williams Co., 26 So.2d 776 (La.App. 1st Cir.1946); reh. den., 27 So.2d 184; and whether the employee's motive arose from personal objectives or, instead, from his employer's concerns, Keen, supra, Johns v. Hunt Lumber Company, Inc., 250 So.2d 543 (La.App. 2d Cir.1971).
A review of the evidence discloses that each of the above factors is present in this case. At the time of this incident, Alvin Dufrene was a sergeant in the New Orleans Police Department, assigned to the Technical Services Bureau, a division which, among other things, maintains custody of police records. Dufrene was commander of the public records unit and was also assistant supervisor of records and identification. Offense and accident records were stored at police headquarters in sophisticated filing machines which, unfortunately, had a tendency to malfunction from time to time. Because it was essential to the police department that its criminal records be available twenty-four hours a day, Sergeant Dufrene was selected to attend a special school in Cincinnati, Ohio to learn how to correct malfunctions in the filing machines if they should arise. Dufrene was also the custodian of the department's major felony reports, which were filed in a room to which he alone had access after normal working hours.
Some time before this incident, the N.O. P.D. maintained a large fleet of unmarked automobiles, many of which were assigned to individual policemen, Dufrene among them. The police officers were allowed to use the automobiles as their own, with little restriction. In response to the rising expense of such a policy, however, a board of review determined that thereafter, a policeman would be allowed the regular personal use of a vehicle only when his duties required it for a specific purpose.
Major Earl Burmaster was a member of that review board and was also one of Dufrene's immediate supervisors. He testified that Dufrene was advised that he should continue to use his unmarked car because his expertise in repairing the record machines was in critical demand at all times. Dufrene's automobile was therefore equipped with a police radio so that even while driving on a personal mission, he *1113 would be available to return to headquarters to repair the record machines at a moment's notice. In short, Sergeant Dufrene was "on call" twenty-four hours a day.
The foregoing facts compel the conclusion that at the time of the collision, Sergeant Dufrene was acting within the course and scope of his employment. It does not stretch the meaning to say that Dufrene conferred a "benefit" to his employer every time he rode in his own police car rather than, for instance, his wife's personal automobile. By virtue of the car's police radio, he was accessible, and his accessibility was deemed vitally necessary to the N.O.P.D. in the performance of its most important functions. Similarly, driving the police car even while on personal missions was itself a part of Dufrene's duty to remain "on call" and subject to his employer's control. Thus, it cannot be said that Sergeant Dufrene's mission was purely personal. Being "on call" at all times, he was therefore duty-bound to use his police car rather than another, and in carrying out that duty, he performed a function of his employment.
Accordingly, we hold that Sergeant Dufrene's tortious conduct "was so closely connected in time, place and causation to his employment duties as to be regarded a risk of harm fairly attributable to the employer's business." Daniels, supra. It follows that the trial court did not err in finding the City liable for Dufrene's negligent act under the doctrine of respondeat superior.

Quantum
The trial court awarded damages to plaintiff Earl Roberts in the amount of $750,641.43. Of that sum, special damages of $60,867.43 were awarded by stipulation; plaintiff Roberts appeals the remaining award of general damages ($659,774.00), arguing that it is insufficient. The defendants also appeal, contending that the award is excessive.
At the time of the accident, Earl Roberts was 27 years of age and earning a gross annual income of $20,800.00 as a maintenance mechanic at Amax Corporation, having attained that position after several years of steady advancement in heavy labor. In his leisure time, Roberts was something of an athlete; an old football injury to his knee required him to keep the leg strong by lifting weights, playing tennis and basketball, and jogging. Roberts was also an avid outdoorsman who enjoyed frequent hunting and fishing trips.
As a result of the rear-end collision, Roberts suffered severe trauma to the cervical region and rupture of the intervertebral disc at C4-C5. Tests also revealed denervation at the C-5 level which, in the opinion of the plaintiff's treating physician, normally cannot be reversed. Since the accident, Roberts has experienced extreme pain in the left scapular area which frequently radiates down to the left arm and, occasionally, to the fourth finger of his left hand (indicating damage to the nerve roots at C-8). Only moderate relief is provided by medication and by the use of a small device worn on the hip which transmits electric impulses through electrodes attached to the painful parts of Mr. Roberts' body. The electric shock produced by the machine overrides the sensation of pain, but does not remove it altogether.
Roberts' injuries have required extensive medical treatment, as evidenced by six separate hospitalizations between the time of the accident and the time of trial. He has undergone two painful myelograms, three discograms, three electro-myelograms, and a disc fusion at C4-C5. According to Dr. Ralph J. Gessner, the plaintiff has a permanent 40-45% functional disability, and will never again be able to perform physical labor; nor will he be able to lift any object heavier than thirty pounds or perform any tasks which require the arms to be raised to shoulder level.
It is clear from the above that the plaintiff's life has been substantially and irreversibly altered by the accident. He is unable to perform even light physical work and has been unemployed since the fusion of his cervical discs in June, 1979. Moreover, Roberts will be unable to enjoy the athletic life he has been accustomed toeven casting a fishing lure causes such discomfort *1114 that it defeats the purpose. His physicians stated that he will continue to endure considerable pain for the rest of his life. He is thirty-one.
The trial court awarded general damages in the amount of $659,774.00. Of that recovery, $359,774.00 represents loss of future wages, that award being derived from calculations offered by plaintiff's expert witness in the field of labor economics, Mr. W.D. Wagner of the University of New Orleans. Wagner figured the plaintiff's losses by multiplying Roberts' after-tax income at the time of the accident ($18,572.00) by his work-life expectancy (thirty-three years), allowing for an annual inflational increase of 6.64 per cent, that sum discounted at 8 per cent. The projected loss ($466,711.00) was then reduced by the amount of net income plaintiff would be expected to receive if he were to soon find employment at minimum wage, taking into account Roberts' minimum annual loss of fringe benefits ($1,150.00). According to Wagner, the difference ($359,774.00) represents the loss Roberts will sustain over the next thirty-three years, the remainder of his work-life.
It has been repeatedly held that a Court of Appeal must not disturb the assessment of general damages by a judge or jury unless the record clearly demonstrates an abuse of the great discretion invested in the finder of fact. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977); La.Civil Code Art. 1934(3). Such deference is particularly appropriate where, as here, we are asked to review an award for loss of future wages, for it is frequently stated that such awards are, by nature, rather speculative and cannot be fixed with mathematical precision. Robinson v. Graves, 343 So.2d 147 (La.1977); Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (La.1968). Each case must be weighed on its own facts, taking into account numerous factors, including the plaintiff's physical condition prior to the accident, his work record, the amount of his earnings in previous years, and the probability or improbability that he would have earned a similar amount during the remainder of his work life if he had not sustained injury. Edwards v. Sims, 294 So.2d 611 (La.App. 4th Cir.1974); Viator, supra. The trial court's findings should therefore prevail unless the method of calculation is patently irrational or the calculations themselves are mathematically inaccurate.
Plaintiff Roberts contends that the award for lost future wages should be increased because the trial court erred in calculating his loss on the basis of net rather than gross income. The weight of authority in this circuit, however, favors the approach taken by the trial judge. In Edwards v. Sims, supra, this Court stated that
"The fact that damages resulting from personal injuries are not subject to income taxation (26 U.S.C. § 104) is interrelated with the question of whether the previous earnings factor should be based on wages before or wages after taxes. Any consideration of damages for loss of wages (past or future) should be based on net income after taxes since a plaintiff's gross earnings before taxes are never truly available to him. As long as only net income figures are considered, the fact that damages received on account of personal injuries are excluded from gross income for income tax purposes is irrelevant." Id. at 616, 617.[1]
Plaintiff's further objection concerning the rate of discount applied in this case (8%) is, again, answered by recognizing that since such matters cannot be resolved by a universally appropriate formula, it follows that the rate of discount to be applied in a given case is within the trial court's great discretion.
Finally, plaintiff urges that the award for future wages was insufficient because it was based upon the trial court's (allegedly) erroneous assumption that Roberts will soon find employment at minimum *1115 wage. In assigning error in this regard, plaintiff relies upon the testimony of Dr. Irving Fosberg of Loyola University, who qualified as an expert in industrial psychology. He stated that, given Roberts' disability and the current labor market, it is unlikely that plaintiff will find work of any kind in the near future.
Dr. Fosberg, however, did not ever meet Roberts in person and therefore did not administer intelligence or personality test which might have revealed the plaintiff's propensity for sedentary occupation. Plaintiff's own physician testified that although Roberts cannot and should not perform physical labor, he is capable of performing desk work and should be encouraged to do so. We therefore find no manifest error on the part of the trial court in calculating plaintiff's loss of future wages on the assumption that he will soon find work at minimum wage.
In conclusion of this subject, we regard the trial court's assessment of these damages as sound and based upon a rational formula which accomplishes justice among the parties. The award to plaintiff of $359,774.00 for loss of future wages is therefore affirmed.
Regarding the final elements of general damages, we now consider the trial judge's award to Roberts of $150,000.00 for permanent disability and $150,000.00 for pain and suffering. We are again reminded that, in the absence of manifest error, an appellate court must not disturb the trial judge's award. Coco v. Winston, supra. Moreover, the scope of our inquiry is narrowly focused upon the individual plaintiff to determine whether he has received just compensation for his injuries in light of his particular circumstances, Reck v. Stevens, 373 So.2d 498 (La.1979), bearing in mind that the object of reparation is to return plaintiff to the condition which he enjoyed prior to the act which caused his damage. Langendorf v. Administrators of Tulane Education Fund, 361 So.2d 905 (La.App. 4th Cir.1978).
The record discloses that Roberts' 40-45% permanent functional disability signals a radical departure from the life which he formerly knew. He now must reshape himself to fit a sedentary workplace, a task which, given Roberts' age and background, will probably be a frustrating re-education. His favorite pursuitsbasketball, jogging, fishing, etc.will be permanently denied, and that loss is inestimable, considering his uncommon inclination to athletic activity. At thirty-two, the plaintiff rightly foresees that the extreme pain which he has suffered since the time of the accident will continue for the rest of his life. Weighing the effect of injury upon this plaintiff, his past and future, we find no manifest error in the trial judge's award. For the reasons assigned, the judgment of the lower court is affirmed in all respects.
AFFIRMED.
NOTES
[1] See also: Teal v. Allstate Ins. Co., 348 So.2d 83 (La.App. 4th Cir.1977); Potts v. Hollier, 344 So.2d 70 (La.App. 4th Cir.1977).