597 So.2d 1 (1992)
Doris N. ELLIS
v.
DOVER ELEVATOR COMPANY.
No. 89-CA-1756.
Court of Appeal of Louisiana, Fourth Circuit.
January 16, 1992.
Rehearing Denied May 13, 1992.
*2 Eugene D. Brierre, New Orleans, for plaintiff/appellee.
James L. Selman, II, Patricia M. Crowley, Gordon P. Gates, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendant/appellant.
Before LOBRANO, WARD and ARMSTRONG, JJ.
LOBRANO, Judge.
This matter is before us on remand from the Supreme Court. We initially reversed and remanded for a new trial. Ellis v. Dover Elevator Company, 573 So.2d 576 (La.App. 4th Cir.1991). On writs to the Supreme Court our decision was reversed and the case remanded with instructions to address the remaining assignments of error. Ellis v. Dover Elevator Company, 580 So.2d 360 (La.1991). We now do so.
Plaintiff, Doris Ellis, filed the instant suit against Dover Elevator Company, and its insurers, Highlands Insurance Company and Liberty Mutual, (collectively referred to as Dover),[1] seeking damages for the injuries she allegedly sustained while operating an elevator at Oschner Hospital. Oschner intervened for the compensation and medical payments. Ellis was employed by Oschner Foundation as a patient escort. On November 7, 1984 she was assigned to operate elevator No. 6, an express elevator. *3 Dover had a maintenance contract with Oschner at the time.
Ellis testified that when she reported to work at 8:00 a.m. the elevator was not operational. Dover was contacted, and Tim Adler was sent to check on the problem. At approximately 9:00 a.m. he put the elevator in service. Approximately, two and one half hours later, as the elevator was descending to the first floor, Ellis testified it began to pick up speed, eventually passed the first floor and came to an abrupt stop. It came to rest some eighteen inches below the first floor.
As a result of the impact, Ellis asserts she sustained personal injuries, principally in the cervical area. After a lengthy trial, the jury returned a lump sum award of $350,000.00. The trial court denied Dover's motion for a new trial and Judgment Notwithstanding the Verdict. This appeal followed.
Dover raises seven issues for our review. One issue has been resolved by the Supreme Court. The remaining issues are consolidated into the following dispositive questions:
1) Trial errors which warrant a new trial.
a) The court erred in reading the stipulated medical expenses to the jury;
b) It was prejudicial to allow plaintiff to read "selected" portions of Adler's deposition to the jury.
c) Various other errors which prevented a fair trial.
2) The Court erred by not granting a JNOV because of plaintiff's failure to prove that Dover was negligent.
a) Plaintiff's expert, Reichert, was allowed to testify beyond his expertise.
3) The jury's lump sum award of $350,000.00 was excessive because:
a) There was no proof of future lost wages.
b) The testimony as to past lost wages was inaccurate.
c) The general damage award was grossly out of proportion to the injuries sustained.
IMPROPER JURY CHARGE
Near the conclusion of the court's charge to the jury, the following instruction was given:
"The parties have by stipulation agreed that the amount of hospital and doctors' bills total the sum of $16,709.30. This information is being furnished to the Jury for the limited purpose of establishing the amount of medical and hospital bills which have been paid to date by the compensation carrier."
Dover objected to the charge after all the instructions were given. The record is not clear how soon thereafter the objection was interposed. Code of Civil Procedure Article 1793 provides that the objection should be made before the jury retires or immediately thereafter. Giving appellant the benefit of the doubt, we consider the merits of its objection.
Dover argues error for two reasons. First, it urges that Ellis failed to introduce into evidence the stipulation referred to and that the court's reference to it was a disclosure of settlement between Dover and Oschner. Second, it asserts that the instruction constituted a comment on the evidence by the trial judge. We disagree.
During the course of the trial Dover and the compensation intervenor, Oschner, entered into a settlement of the intervention. The settlement dictated into the record by Dover's counsel, provided that the compensation benefits of $28,593.68 and medical expenses of $16,709.30 paid by Oschner on Ellis' behalf would be assigned and transferred to Dover as well as the "preferences and priorities accorded Oschner" as the intervenor. The dollar amounts were derived from a previous joint stipulation of all parties identified as intervenor Exhibit 1.
Although Dover is correct in its assertion that normally the terms of a settlement should not be disclosed to the jury, that is not the situation in the instant case. The instruction complained of did not mention anything about a settlement, it referred to the stipulation (Intervenor's Exhibit 1) between the parties. The stipulation specifically states that all parties agree that Oschner paid medical expenses of $16,709.30 *4 on behalf of Ellis as a result of the November 7, 1984 accident. Furthermore, the instruction emphasized the "limited purpose" of establishing the amount paid by the compensation carrier. Contrary to Dover's assertion, there is nothing in the charge to suggest that the medicals were the result of the elevator accident. In fact the record is replete with Dover's evidence and arguments concerning lack of connexity. The jury was free to decide what, if any of the expenses, were attributable to this accident.
In addition, Ellis testified on cross-examination that Oschner paid her medical bills. Advising the jury of the stipulated amounts was consistent with this testimony. Under these circumstances, we cannot conclude that it was an improper comment by the judge, nor can we say it was prejudicial. READING ADLER'S DEPOSITION
Dover complains that it was error to allow Ellis' attorney to read selected portions of Tim Adler's deposition near the close of plaintiff's case. Dover asserts that it placed too much emphasis on those portions. It further argues that the deposition was cumulative.
Plaintiff called under cross, Tim Adler, as her first witness. During the course of his testimony plaintiff's counsel referred Alder to certain portions (pp. 18 and 19) of his previous deposition. The use of the deposition was for impeachment purposes. Counsel then placed the entire deposition in evidence and asked the court's permission to show the specific pages to the jury. The court deferred ruling on the request at that time.
Shortly before plaintiff rested her case (approximately the third day of trial), counsel again requested the court's permission to read the selected pages of the deposition to the jury. The court ruled that the deposition could not be taken to the jury room but allowed a reading of those pages previously used for impeachment.
Again, we note that the record is not clear whether Dover lodged an objection. Counsel stated: "I don't know what we are talking about, what he is talking about. I think that is part of his [plaintiff's attorney] cross-examination. If he wanted to do it, he could have done it. He didn't do it." The law is settled that to preserve an error for appeal there must be an objection, and the grounds therefore stated. La.C.C.Pro. Art. 1635; L.C.E. Art. 103(A). We give Dover the benefit of the doubt and address the merits of the "objection".
Code of Civil Procedure Article 1450 allows the use of depositions for impeachment purposes. The trial judge correctly prohibited the jury from taking the deposition in the jury room. C.C.Pro. Art. 1794. We find no rule of law which prohibits the reference or reading of a portion of a deposition in an impeachment attempt. Dover's complaint is that it should have been read while Adler was testifying, not several days later. If Adler had not been subsequently called by Dover in its case-in-chief, there may be merit to Dover's argument. However, Dover did have the "last say" on the subject since Adler's testimony corrected any harm that may have occurred because of the deposition. Under these circumstances, we cannot conclude that the error was so prejudicial as to warrant a new trial.
OTHER ERRORS
Dover complains of various other trial errors which it asserts had the cumulative effect of a prejudicial trial. In one instance it refers to the dropping of a book by plaintiff's counsel which had no relevance to the proceedings. Without going into detail, we agree it was disruptive, was not proper and should have been discussed with the court prior to trial. Even the trial court noted this. Dover's complaint is that there should have been an admonishment to the jury. We cannot say the error warrants a new trial. However it has been considered by this court in reviewing this case.
We find no merit in the other two complained of errors.
Plaintiff failed to meet her burden of proof of negligence.
Dover asserts the trial court erred by not granting its motion for judgment notwithstanding *5 the verdict and/or motion for a new trial.
A judgement notwithstanding the verdict, similar to a directed verdict, should only be granted when the facts and inferences point so strongly in favor of one party that reasonable people could not reach a contrary verdict. It is not appropriate when there is a preponderance of the evidence but only when the evidence points to one conclusion. Wilson v. Hibernia, 517 So.2d 1206 (La.App. 4th Cir.1987), writ den. 520 So.2d 425 (La.1988), citing, Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986). Likewise, a motion for a new trial should be granted when the judgment appears clearly contrary to the law and the evidence. La.C.C.Pro. Art. 1972(1).
Our review of the negligence issue is guided by the standards set forth in Lirette v. State Farm Insurance Company, 563 So.2d 850 (La.1990). In that case, the court noted:
"It is well settled that a court of appeal may not set aside a finding of fact by a trial court or a jury in the absence of `manifest error' or unless it is `clearly wrong', and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. [citations omitted]
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra at 844; [citations omitted]
The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound." [citations omitted]
THE EVIDENCE:
Dover's employee, Tim Adler was qualified and accepted as a service maintenance expert trained in the maintenance, repair, cleaning and overall care of elevators. He was employed full time at Oschner to maintain and repair a total of twenty-seven elevators.
Adler stated that at approximately 8:00 a.m., the day of the accident, he was called to repair elevator number six. Upon his arrival he found the elevator had stopped approximately eighteen inches below the first floor sill. The doors were open and passengers were standing in the elevator. He closed the doors of the elevator and ran the elevator up until it was level with the first floor. The passengers then left the elevator. Adler then testified that he repaired the first terminal slowdown switch. He then placed the elevator back in service. Adler further testified that several hours later he was called again concerning a problem with elevator number six. When arrived he again found the elevator had stopped below the first floor sill. Again he raised the elevator level with the first floor to let the passengers out. He then testified that he ran the elevator for at least three hours and it worked properly. Unable to find the cause of the earlier malfunction, he decided to change all the first floor slowdown switches during which he discovered that all the switches had been incorrectly set. Adler admitted that when he repaired the first terminal slowdown switch at 8:00 a.m., he did not check for electrical shorts.
Robert Reichart was qualified and accepted as an elevator inspector. He inspected elevator number six on two occasions following the accident. He stated that the markings on the undercarriage coupled with the testimony of Hillary Pierce who stated that the elevator stopped abruptly then bounced back up, indicates the elevator came to a sudden stop either by hitting the oil buffers or activating the final limit switch. He explained that the final limit switch is not engaged unless the terminal stopping switches malfunction. In addition, he stated that whenever the *6 safety mechanism on an elevator fails, the elevator should be taken out of service.
As a maintenance contractor, Dover's duty was to exercise reasonable care in the performance of services under its contract with Oschner. Austin v. Otis Elevator Company, 336 So.2d 914 (La.App. 4th Cir.1976). The maintenance agreement provided that Dover will use all reasonable care to maintain the elevator equipment in proper operating condition. It further specified that Dover would regularly and systematically examine, adjust, lubricate as required, and if conditions warrant, repair or replace a list of machine, motor, generator and controller parts, including contacts and other mechanical and electrical parts. Dover also agreed to make any adjustments, repairs and replacements which it deemed advisable to make. In addition, the agreement specified that the adjustments, repairs and or replacements to be made will be such as are reasonably necessary by the examination.
Thus, given the evidence presented, reasonable jurors could have concluded that Dover breached its duty to exercise ordinary care in the performance of services to the elevator by not properly and fully inspecting and repairing the malfunction which occurred a few hours prior to the accident. The evidence established without contradiction that the elevator failed to stop level with the first floor sill twice on the day of the accident, the second time causing injury to plaintiff. The second malfunction was identical to the earlier one. The repair order submitted by Adler showed that at 8:00 a.m. he repaired the first terminal slowdown switch. Yet, his own testimony revealed that, following the second malfunction, he discovered that all the terminal slowdown switches were improperly set. We cannot conclude that the jury finding is manifestly erroneous.
QUANTUM:
Dover argues that the lump sum award of $350,000.00 is grossly excessive. We agree and lower the award to $200,000.00, the highest amount a reasonable trier of fact could have awarded.
Review of a damage award, first, a determination of whether there has been an abuse of discretion by the trial court. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Weaver v. Siegling, 569 So.2d 97 (La.App. 4th Cir.1990), writ denied 572 So.2d 67 (La.1991). Upon finding an abuse of discretion, the reviewing court may resort to prior damage awards to lower the award to the highest amount (or, alternatively, raise the award to the lowest amount) reasonably within the discretion of the trial court. Id.
We find that the trial court abused its discretion in awarding a lump sum of $350,000.00. The testimony presented indicates that Ellis' reached maximum medical improvement seventeen months after the accident, at a level of 10-15% permanent partial disability. She continued to suffer mild cervical pain at that time, but was capable of resuming her former job or beginning another of similar pay level.
Three doctors testified as to the injuries sustained by Ellis as a result of the elevator accident.
Dr. Kenneth Vogel, a neurosurgeon, had primary responsibility for Ellis' care. He performed an anterior spinal fusion operation on Ellis, and examined her on thirteen occasions; ten of these exams were conducted prior to May 23, 1987, the date on which Ellis was involved in an automobile accident.
Dr. Vogel first examined Ellis on January 3, 1985 for neck and left arm pain. As to prior injuries, Dr. Vogel testified that "[s]he denied all other injuries except for the history of previous laminectomy. She told me she had complete relief of her pain from that laminectomy in the 1970's." Dr. Vogel summarized his initial diagnosis as follows: "I felt she had lumbosacral strain which I felt was resolving satisfactorily and a herniated cervical disc." A February 5, 1985 examination revealed the same symptoms and findings.
Ellis was hospitalized March 24, 1985. She underwent various evaluations, including a CAT Scan of the lower back, a lumbar discogram, a myelogram of the cervical *7 and lumbosacral region, and cervical X-rays. On March 27, 1985, Dr. Vogel performed an anterior spinal fusion operation on Ellis at C6-7.
At her first post-operative examination on May 14, 1985, Ellis complained of cervical, left arm, mild low back, and bilateral pain. Dr. Vogel noted focal muscle spasms in both the neck and low back. Dr. Vogel felt Ellis was progressing satisfactorily, and told her to continue rehabilitation.
Ellis phoned Dr. Vogel on May 22, 1985, complaining of shortness of breath and chest pain. The next day, Ellis was diagnosed as suffering from post-operative dysphagia (difficulty swallowing), and was admitted to the hospital. Dr. Vogel treated Ellis for dysphagia and other pain in her neck. Dr. Vogel explained that neck soreness was a typical post-operative complaint of spinal fusions, resulting from manipulation of the esophagus and trachea during surgery, and that such pain usually resolved in a month to six weeks. Dysphagia was a less frequent complaint which, in Ellis' case, required hospitalization to determine whether she was healing correctly.
Dr. Vogel next saw Ellis on June 27, 1985. Ellis complained of minimum cervical pain, some dysphagia, and pain in her right hip. For the first time since the accident, she was free of muscle spasm in the neck region. On August 6, 1985, Ellis complained of a sensation of choking and of right hip pain. She had mild limitation of motion in her neck, and no muscle spasm. Dr. Vogel recommended continued evaluations by an ENT for the dysphagia, an orthopedic evaluation of the right hip, and continued rehabilitation of the cervical region.
Following a January 2, 1986 visit, Dr. Vogel reached an opinion as to Ellis' total disability. Dr. Vogel felt that Ellis had incurred an approximate 10-15% permanent partial total body medical impairment, and that she would reach maximum medical improvement approximately one year after the operation. He advised Ellis to avoid activities requiring repetitive lifting/pulling of greater than 35 pounds or hyperextension of the neck. Dr. Vogel reaffirmed his assessment of Ellis' total disability at an April 29, 1986 examination. Dr. Vogel's notes from the April 1986 visit indicate that he felt Ellis should be considered to have reached maximum medical improvement on March 27, 1986, one year post-operative.
Dr. Vogel examined Ellis on two more occasions in regard to her anterior cervical fusion. A July 1, 1986 examination revealed only mild limitation in the cervical area, and no muscle spasm. Dr. Vogel conducted his final post-operative examination on September 4, 1986. Ellis was still suffering from mild neck pain and had mild limitation of motion in her neck. Her dysphagia had resolved. Dr. Vogel made a final recommendation of conservative care, physical therapy, and medication.
Ellis was involved in an automobile accident on May 23, 1987. Dr. Vogel examined Ellis on June 4, 1987, and testified as follows as to the change in Ellis' condition as a result of the automobile accident: "As I recall nine months earlier there was only mild neck pain. Now she has neck and left arm pain. They are dramatically increased. The low back symptoms increased but less dramatic (sic)." Dr. Vogel testified on cross that Ellis had been in good health before the automobile accident, suffered an immediate onset of low back, left leg, neck, and left shoulder symptoms following the accident, and that she never reached the point of recovery she had reached at her final post-operative visit of September 4, 1986. At his final examination of Ellis on January 16, 1989, Dr. Vogel recommended that she be admitted to the hospital "for conservative care primarily to include functional capacity evaluation, cervical and spinal rehabilitation and also she be evaluated by an internist and by a psychologist with the idea of resolving the majority of these complaints and allow her to return to a more normal type of lifestyle."
Dr. Gordon Nutik, an orthopedic surgeon, examined Ellis on one occasion, July 31, 1986, for purposes of assessing Ellis' application for Social Security Disability Benefits. Dr. Nutik took a history, gave Ellis a physical, and took X-rays. Ellis *8 complained of pain in her neck and low back, and numbness in her lower left extremities. Dr. Nutik made the following findings: a mild restriction of neck motion, attributable to Ellis' anterior cervical fusion; no active cervical nerve root irritation; degenerative arthritic changes at acromioclavicular joint of left shoulder; residual degenerative changes at the L5 sacral disc space, attributable to a 1973 laminectomy operation at L5; mild restriction of the lower back, with no active nerve root irritation in the low back nerves; no anatomical explanation for numbness in lower left extremities; and no disability about the lower left extremities. Dr. Nutik summarized his findings as follows: "I felt the patient's main disability resulted as residual findings from the prior neck and low back surgeries. I felt that the patient would be restricted to moderate to heavy lifting, climbing or excessive stooping. It was my feeling that the patient had clinical findings consistent with the symptoms that she presented to me at the time of the examination."
On cross-examination, Dr. Nutik testified that the degenerative changes observed in Ellis' shoulder were due to osteoarthritis. Dr. Nutik stated, "I have to say that I think it is unlikely that a cervical spine fusion would contribute to the development of arthritis in a shoulder at all." Dr. Nutik summarized the restrictions he would place on Ellis as follows: "no ladder climbing, no overhead work, no reaching with left upper extremity, and probably no lifting over 50 pounds related to the neck alone."
Dr. Richard Vila testified briefly as to an Esophageal Motility Test he conducted on Ellis on September 27, 1985. Dr. Vila testified that he conducts all of Charity Hospital's Esophageal Motility Tests. After describing the Esophageal Motility Test, Dr. Vila testified that Ellis' test was normal, "meaning the contraction of the body of the esophagus and the upper one-third with swallowing are normal and, therefore, capable of pushing the food down through the body of the esophagus down into the stomach."
Dover argues that the record does not support a claim for future lost wages, and supports a maximum award of $16,893.50 for past lost wages. Although a lump sum was awarded, there is merit in Dover's argument.
Dr. Vogel testified that Ellis was disabled from holding gainful employment only until March 27, 1986, a seventeen month period following the accident.
Nancy Favaloro, an expert in the field of health and vocational rehabilitation, testified as to Ellis' future employment prospects. Favaloro was contacted by Oschner about performing a rehabilitation evaluation and job search for Ellis. Favaloro interviewed Ellis on August 27, 1987. Ellis did not inform Favaloro of her May 1987 automobile accident. Based upon Ellis' educational level, prior employment history, and medical condition, Favaloro determined that Ellis could be successfully employed in production work, for example as a cafeteria worker, a belt maker, or a cutting machine operator. Favaloro summed up her evaluation as follows: "My impressions were that there was a possibility, a good possibility that she would be able to return to alternate work and also some possibility that she would be able to return to her job that she had at Oschner when she reached a point of maximum medical cure or when the doctor felt she was able to resume work."
After determining Ellis' skill level, Favaloro conducted a labor market survey. Favaloro wrote an October 16, 1987 report listing a dozen companies which had expressed an interest in interviewing a person with Ellis' skill level. Neither Ellis nor her attorneys ever contacted Favaloro concerning these job leads. Favaloro testified that the job opportunities contained in her October 16, 1987 report fell within the physical activity restrictions recommended by Dr. Vogel. Favaloro concluded that it was "quite possible" Ellis could return to her former job as a patient escort, because the tasks performed by a patient escort fell within the guidelines recommended by Dr. Vogel.
*9 Two experts testified as to the amount of past and future lost wages. Ellis' expert, W.E. Groves, stated that Ellis had suffered $44,543.00 in past lost wages, and would suffer $62,353.00 in future lost wages. However, Groves admitted that his figures represented the maximum possible loss, stating, "It is my custom to give the Court one hundred percent disability and then let the jury determine what percentage of disability is involved," and that "There is no way I can tell how much she is disabled or whether she can go back to work or not. I am giving you the one hundred percent figure." Dover countered Grove's testimony with that of Kenneth Boudreaux, a professor of economics and finance at Tulane University. Based on Ellis' former salary as a patient escort, Boudreaux testified that Ellis lost $12,135.66 (after taxes) during the seventeen month period in which she was disabled from holding employment.
Considering the entirety of the evidence summarized above, we conclude that the jury's award of $350,000.00 was an abuse of discretion. Ellis physical condition improved steadily following surgery. Seventeen months after the accident, she had reached maximum medical improvement at a level of 10-15% permanent partial disability. She continued to suffer only mild neck pain. Though her physical activities were somewhat restricted, she was capable of resuming her former job, or beginning another of similar pay level.
A review of herniated cervical disc damage awards reveals that $200,000.00 is the highest amount reasonably within the trial court's discretion. See e.g. Rollins v. Elks Place Professional Plaza, 505 So.2d 149 (La.App. 4th Cir.1997) ($175,468.05 for future medical expenses, lost wages, lost earning capacity, and general damages resulting from double disc herniation); Wolfshohl v. Boudreaux, 482 So.2d 954 (La. App. 3rd Cir.1986) ($40,000.00 for pain and suffering and $60,000.00 for loss of earning capacity resulting from double disc herniation); Williams v. City of New Orleans, 433 So.2d 1129 (La.App. 4th Cir.1983) ($125,000.00); Johnson v. Dufrene, 433 So.2d 1109 (La.App. 4th Cir.1983) ($150,000.00 for permanent disability, $150,000.00 for pain and suffering); Morris v. State Through Dept. of Transportation, 461 So.2d 606 (La.App. 1st Cir.1984) ($125,000.00); Villavaso v. St. Farm Mutual Automobile Ins. Co., 424 So.2d 536 (La. App. 4th Cir.1982) ($250,000.00 double disc rupture).
For the reasons assigned the judgment is amended to lower the award to $200,000.00. In all other respects it is affirmed. Both parties to pay the costs of this appeal.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] There were other named defendants who were dismissed prior to trial and are not part of this appeal.