633 So.2d 368 (1994)
Rose RABITO and Anthony Rabito
v.
OTIS ELEVATOR COMPANY, et al.
Rose RABITO and Anthony Rabito
v.
MEDICAL CENTER OF EAST NEW ORLEANS, et al.
Nos. 93-CA-1001, 93-CA-1002.
Court of Appeal of Louisiana, Fourth Circuit.
February 11, 1994.
Rehearing Denied March 17, 1994.
*370 C. Edgar Cloutier and Richard J. Garvey, Jr., Christovich & Kearney, New Orleans, for defendant/appellant.
Robert M. Johnston, Anne Derbes Keller, Adams and Johnston, New Orleans, and John T. Bennett, Marksville, for plaintiffs/appellees.
Daniel A. Webb and Daniel A. Tadros, Hoffman, Sutterfield, Ensenat & Bankston, New Orleans, for intervenor/appellant.
Before BYRNES, WARD and PLOTKIN, JJ.
BYRNES, Judge.
Otis Elevator Company ("Otis") appeals a judgment notwithstanding the verdict in which the trial court found Otis liable for injuries suffered by Rose Rabito, who tripped and fell as she was entering an elevator. We reverse.
On April 13, 1988 Rose Rabito entered an elevator on the first floor in the Medical Center of East New Orleans ("Medical Center") on the way to her employer's office on the seventh floor. The elevator was manufactured and installed by Otis and the Medical Center had a contract for Otis to maintain the building's elevators and to provide "callback" service as needed.
On December 27, 1988 Rose Rabito filed suit against Otis, claiming that Otis had manufactured a defective elevator and had negligently failed to maintain it. In a subsequent pleading, she alleged that Otis was strictly liable as custodian of the defective elevator. Anthony Rabito joined the suit, seeking damages for loss of consortium and plaintiffs filed another suit against the Medical Center and its insurer, Hanover Insurance Company, based on negligence and strict custodial liability claims. Highlands Insurance Company, the worker's compensation insurer of Mrs. Rabito's employer, intervened, seeking reimbursement for medical and worker's compensation paid to Mrs. Rabito, as well as credit for future compensation obligations. The cases were consolidated and a jury trial *371 began in January 1992. During the trial the plaintiffs settled and dismissed their claims against the Medical Center. The jury found that Mrs. Rabito was not injured as a result of a defect in the elevator; that the elevator was not in the care, custody or control of Otis; that Otis was not negligent, and that Otis was not at fault. The jury found that the Medical Center was not negligent but had custody and control of the elevator and was 75 percent at fault. The jury held that Rose Rabito was negligent and 25 percent at fault. The jury awarded a total of $174,917 in damages to Mrs. Rabito and $10,000 to Mr. Rabito for loss of consortium.[1]
*372 Based on the jury verdict the trial court filed its judgment, dismissing Mr. and Mrs. Rabito's claims against Otis at plaintiffs' costs and prejudice on February 7, 1992. However, after a hearing, the trial court denied a new trial but granted a judgment notwithstanding the verdict (JNOV) and on March 31, 1992, the trial court entered a judgment against Otis in favor of Rose Rabito in the sum of $976,249.45 and in favor of Anthony Rabito for $50,000. On July 29, 1992 the trial court entered a judgment in favor of plaintiffs and against Intervenor Highlands Insurance Company, for $24,052.76 for costs incurred in prosecution of the claim that resulted in settlement with the Medical Center and Hanover Insurance Company. Otis and Highlands' appeals followed. Plaintiffs answered the appeal, claiming that the trial court erred in denying a conditional new trial.
On appeal Otis contends that the trial court erred in: (1) granting plaintiffs' judgment notwithstanding the verdict on the issues of liability and damages as well as Rose Rabito's contributory negligence; (2) in not reducing plaintiffs' recovery based on their settlement with the Medical Center and its insurer; and (3) making an award to the husband for loss of consortium.
A judgment notwithstanding the verdict, similar to a directed verdict, should only be granted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. LSA-C.C.P. art. 1811; Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991). It is not appropriate when there is a preponderance of the evidence but only when the evidence points to one conclusion. Ellis v. Dover Elevator Co., 597 So.2d 1, 5 (La.App. 4 Cir.), writ denied 604 So.2d 973 (La.1992). The determination of causation is a question of fact. Anglin v. White, 572 So.2d 779, 782 (La.App. 4 Cir.1990). The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony. Lirette v. State Farm Insurance Co., 563 So.2d 850, 853 (La.1990); Ellis, supra, 597 So.2d at 5.

Otis' Liability
To prove negligence, the plaintiffs must show that Otis as the maintenance contractor breached its duty to exercise reasonable care in the performance of services under its contract with the Medical Center and that Otis' conduct was a cause in fact of the resulting injury. Ellis, supra, 597 So.2d at 6. In its reasons for judgment, the trial court stated that, "[a]ll of the evidence, facts and inferences point so strongly and overwhelmingly to the fact that a lack of maintenance caused the resulting misleveling that the motion for judgment notwithstanding the verdict on this issue must be granted." To reach this conclusion the trial court had to determine that reasonable men could not reach a contrary result.
According to the maintenance and repair contract between Otis and the Medical Center, Otis was responsible for checking the elevators and performing maintenance upkeep every two weeks as well as providing emergency minor adjustment callback service. The trial court found that Mrs. Rabito and Mr. Dallimore, the Medical Center's building maintenance supervisor, presented substantial evidence but "Otis presented no contradictory evidence" that Mrs. Rabito was injured as a result of a defect in the elevator.
*373 Mrs. Rabito was unsure whether she fell in the first or second elevator although after the accident Mr. Dallimore found that the number two elevator was misleveling erratically on different floors but not on all floors. He testified that he took the number two elevator out of service, placed a barricade by the elevator, and called Otis. Although no one confirmed that an Otis employee went to the Medical Center, Mr. Dallimore testified that the elevator was running properly when he checked the elevator before 9:30 a.m. on the day of the accident and the next morning. Mrs. Rabito could not testify that she saw the elevator barricade when she used the elevator to go to Dr. Rabito's office or when she went home during the day.
Mark Jude Rabito, administrator of the Medical Center, testified that he went to see his aunt and godmother, Mrs. Rabito, on the seventh floor where she worked for Dr. Daniel Buras. Mr. Dallimore, Dr. Buras, Mrs. Buras, and Mark Rabito testified that Rose Rabito had ice packs on her arms in Dr. Buras' office. Mrs. Rabito told Mark that she was embarrassed and felt clumsy when she fell. Mark Rabito testified that between 11:00 and 1:00 on the day of the accident, Mr. Dallimore told him that he had not called Otis but related that he would when Mark Rabito said he should. Mark Rabito was not aware that a yellow barricade was placed in the front of the elevator on the day of the accident.
In the accident report dated May 19, 1988, completed over a month later, Mr. Benjamin Bourgeois, the Medical Center comptroller responsible for building maintenance, stated that the accident occurred on the seventh floor although Ms. Rabito declared that the accident occurred on the first floor.
At her deposition, Mrs. Rabito testified that after she fell, she could see that the elevator was six to twelve inches above the floor. Mr. Fred Liebkemann and Thomas G. Moskal, plaintiffs' elevator expert witnesses, agreed with Otis' elevator expert witness, Earl Jackson Abraham's testimony that the doors would automatically close if the elevator went two and one-half inches above or below the floor. At trial Mrs. Rabito testified that the elevator was not even with the floor by a little bit more than three-quarters of an inch although the elevator floor seemed to be six to twelve inches above the floor of the building. Further, Mr. Dallimore could not remember whether he observed the elevator floor misleveling above or below the floor of the building. He told Mrs. Rabito that he tripped, hit his head, and fell out of the elevator that day; however, he had not called Otis to report the misleveling after his fall.
Plaintiffs' elevator expert witness, Thomas G. Moskal, testified that lack of maintenance was the underlying cause of the accident. Moskal opined that an under-compounding situation, where the elevator was not receiving sufficient electrical power, was caused by failure of Otis to: (1) maintain the brushes which would wear down in the motor or generator, and (2) blow out accumulated carbon dust. He agreed that the procedure of changing brushes is done one at a time on a gradual basis. In his deposition, Mr. Moskal found no improper maintenance on the part of Otis when he inspected the elevators, and the equipment appeared to be properly maintained.
Fred Liebkemann, a mechanical engineer with an expertise in elevators, also testified on behalf of the plaintiffs. He found that the basic underlying cause of the accident was the failure to maintain the equipment or to use preventive maintenance. Although he stated that the number two elevator failed to level repeatedly when he inspected it with Mr. Dallimore on December 27, 1990, Mr. Liebkemann testified that the key to the elevator was turned off, but Mr. Dallimore did not put up a barricade, and Mr. Liebkemann could not say that Mr. Dallimore called Otis on that date. Otis had no record of a callback on December 27, 1990 when Mr. Liebkemann inspected the elevator. Mr. Liebkemann admitted that there was no evidence that the number two elevator was not leveling properly before 9:30 a.m. on April 13, 1988. Mr. Liebkemann agreed that Mr. Dallimore found that the elevator was working properly when he checked it that morning.
Mr. Abraham, who testified on behalf of Otis as its employee and expert in the field of *374 installation, adjustment, maintenance and repair of elevators, saw no improper maintenance and no excessive wear, grooving, burning or other damage when he inspected the elevator. Mr. Abraham explained that compounding was not critical in a small elevator such as elevator number two. He noted that the elevator might level a little slower but would level. For the compounding to occur erratically, Mr. Abraham stated that four of the brushes would physically have to be lifted up. If the brushes were changed one at a time, there would be little effect on compounding.
The trial court noted that the plaintiffs presented evidence showing that in October 1987, six months before the accident, the Otis maintenance supervisor, Charles Weiss, found that preventative maintenance was required to clear the motor and the motor generator to insure that brush holders were functioning properly. The instruction stated:
"Complete these items by 10/30/88:
Blow out, clean generators, free up & clean brush holders."
The trial court stated that the maintenance was not performed until several months after the accident. However, to comply with the instruction, work was not required to be completed until October 30, 1988. Mr. Abraham explained that preventive maintenance was ongoing and was completed on a continuous basis. Mr. Abraham also testified that the instruction to blow out a generator and free up the brushes was to prevent damage to the generator itself and the presence of carbon in a generator would have no effect on the elevator's ability to level.
The trial court asserted that plaintiffs presented uncontradicted direct evidence that the Otis maintenance mechanic responsible for maintaining the elevators in the Medical Center had not performed the necessary and required maintenance of the elevators before the accident. Mr. Frank Mumphrey did not testify at trial but the court allowed the plaintiffs to introduce his depositional testimony from another case in federal court, Law v. Otis Elevator Company, unpublished, 1990 WL 103673 (E.D.La.1990), which involved the South Central Bell building which was assigned on the same route as the Medical Center (Route 11) at the time of Mrs. Rabito's accident. Mr. Mumphrey, the Otis maintenance worker assigned to Route 11, testified that he was overworked and it was impossible to do all of the maintenance work on his route when he had to perform additional callback repairs. However, he stated that he had no specific recollection where he performed scheduled maintenance and he testified that he was doing a good job of maintaining the elevators. The callback record does not show that Mr. Mumphrey was overloaded with callback repairs. The jury could conclude that Mr. Mumphrey's depositional testimony provided no direct evidence that he failed to perform the scheduled maintenance on the number two elevator in the Medical Center.
Donnie B. Bourgeois, Otis' sales manager, and Mr. Earl Jackson Abraham, Otis' elevator expert witness, testified that the Otis mechanic Frank Mumphrey's workload was light as compared to Otis' normal requirement. Mr. Mumphrey was given 161 hours of monthly work whereas Otis' standard workload was 173 hours a month. Locally Otis had three lighter routes and eleven heavier routes than the one assigned to Mr. Mumphrey. The trial court noted that Frank Mumphrey was fired six days before the accident. Donnie Bourgeois and Charles J. Weiss, Otis' district maintenance supervisor, testified that Mr. Mumphrey was laid off because of work reduction, as well as the fact that although he was experienced in the mechanics of elevators such as those located in the Medical Center, he refused to pick up the new micro-process technology for newer elevators, and he was hard to reach and not easily available for callbacks because he lived in Mississippi.
The trial court concluded that Otis did not maintain records of local callbacks or records of maintenance performed in the Medical Center.
Mr. Abraham, Otis' elevator expert employee, testified that the national answering service employed forty operators with three shifts on a twenty-four hour basis. The Otis operators were always available to take calls. Mr. Abraham stated that when an operator takes a call, the elevator history appears on *375 the computer screen and information is entered. The mechanic must complete the record for each callback. Each 1-800 callback lists the time of call, the time the mechanic was first paged, when he was dispatched, when he arrived at the building, and when the work was completed. Mr. Abraham explained that callbacks are evaluated to see if they are excessive in any particular area, and monthly reports are issued for maintenance of each elevator.
Mr. Dallimore testified that he could not recall whether he called the Otis 1-800 telephone number or the local office. Mr. Dallimore thought he had called the 1-800 number, but it was busy so he called the local Otis telephone number. Mr. Abraham testified that the 1-800 number could never be busy because the caller would be put on hold until an operator could take the call. Mr. Dallimore agreed with Mr. Donnie Bourgeois, Otis' sales manager, that in 1984 Otis notified their customers that Otis changed from keeping local records to installing a national computer records system. Otis would maintain records for callbacks reported as well as repairs made in response to callbacks. Otis requested that its customers use the 1-800 number for purposes of the computerized record system. Mr. Abraham testified that if a callback was made to the local Otis telephone number, the local Otis office would call the 1-800 number to insure that the call would be logged in the national computer records system. Otis had no record of a callback from the Medical Center on April 13, 1988.
Although the trial court concluded that there was a legal inference unfavorable to Otis for having undertaken repair work that destroyed evidence of the causation of the defect, the jury could have concluded that Mr. Dallimore may not have called Otis, and Otis may not have repaired the elevator on April 13, 1988, indicating that the elevator may not have misleveled since it was working properly the next morning.
Mr. Abraham reviewed the record of callbacks for elevator number two for nine months from August 1987 to May 1988. The first callback shows that Mr. Dallimore reported that the number two elevator doors were shaking on the first floor. Two months later the next callback noted that the doors would close partway and then reopen and had to be adjusted. One month later, the number two elevator was stuck on the fifth floor with passengers because the door vane went behind the roller instead of between the two rollers of the double doors, caused by someone opening the doors a little bit so that the elevator shut down. Next, the elevator was reported to be stuck on the first floor with the doors closing very slowly. Mr. Abraham noted that on the same day in November 1987 when a report was entered that a door vane was behind the roller, someone in the elevator pulled the cable, which is a spring loaded device that insures that the outside doors closed. The cable was reported broken and had to be replaced. Twelve days later another callback report was entered that the vane door was behind the roller, caused by someone opening the doors a little bit. On March 25, March 28 and April 6, 1988 the PC (printing circuit) board was replaced. Mr. Abraham found that none of the callbacks had anything to do with misleveling or compounding. He asserted that not one callback indicated a maintenance problem. On May 11, 1988 although the number two elevator was not level at the third floor, the mechanic found the elevator running properly when he arrived at the building. Mr. Abraham testified that Mr. Dallimore signed the records that were kept of Otis' regular maintenance performed biweekly but the records did not specify what work was done.
Plaintiffs assert that the negligence theory of res ipsa loquitur applies. In Spott v. Otis Elevator Co., 601 So.2d 1355 (La. 1992), the Louisiana Supreme Court held that res ipsa loquitur may be invoked against an elevator maintenance contractor if three requirements are met: (1) the circumstances surrounding the accident are so unusual that, in the absence of other pertinent evidence, there is an inference of negligence on the part of the defendant; (2) the defendant had exclusive control over the thing causing the injury; and (3) the circumstances are so unusual that the only reasonable and fair conclusion is that the accident was due to *376 a breach of duty on the defendant's part. In Spott, the Supreme Court found that the elevator maintenance owner rebutted any presumption of negligence. The Louisiana Supreme Court held that the plaintiff failed to establish negligence where there were no reports of the elevator malfunctioning before or after the incident.
To prove strict liability, plaintiffs must show that Otis was the owner or had care, custody or "garde" of the elevator and that under the circumstances the elevator presented an unreasonable risk of harm which resulted in the plaintiff's damage. LSA-C.C. art. 2317; Loescher v. Parr, 324 So.2d 441 (La.1975); Spott, supra; Coleman v. Otis Elevator Co., 582 So.2d 341 (La.App. 4 Cir.1991). In Spott, supra, the Supreme Court stated that a service contract by itself did not support a conclusion that Otis had "garde" or control over the elevator so as to be found strictly liable for an accident that occurred on an elevator when the owner was the primary party benefiting from the elevators on its premises and the service contract provided that the maintenance firm employee would check the owner's elevators once weekly and that the owner retained control over the elevator. See also Jolly v. Otis Elevator Co., 620 So.2d 497 (La.App. 4 Cir. 1993). In the present case, Otis had a similar contract with the Medical Center but was required to perform maintenance inspections and repairs every two weeks rather than weekly. The service contract stated, "It is agreed that we [Otis] do not assume possession or control of any part of the equipment but such remains yours [Medical Center] exclusively as the owner (or lessee) thereof." In the present case Otis provided evidence to dispute that the elevator failed to level. Based on circumstantial evidence, the jury could infer that the plaintiff tripped without the elevator misleveling. Further, Otis provided evidence from which the jury could conclude that Otis did not have custody, control or "garde" over the elevator.
In Coleman, supra, this court concluded that Otis had "garde" of the elevators where an Otis employee was employed exclusively to work forty hours a week to maintain the elevators at Charity Hospital, and the Otis employee was physically on the grounds full time. In that case this court found that the question of "garde" or custody is largely one of fact and not one of law.
In Short v. Otis Elevator Co., 502 So.2d 1100 (La.App. 4 Cir.), writ denied 503 So.2d 465 (La.1987), this court found that in the absence of any warning of a potential leveling problem, the passenger is entitled to presume that the elevator will level properly. However, in that case the evidence was sufficient to support a finding of liability under a theory of products liability. In that case there were three complaints prior to the accident that the same elevator failed to level and two more after the accident. This court concluded that the elevator's repeated failure to level outweighed its social utility. The elevator maintenance company had been placed on notice and had knowledge of the defect and did not correct it. In the present case the jury could conclude that there was no prior evidence of misleveling so that the utility of the elevator outweighed any potential danger. In discussing liability under a theory of negligence, the trial court instructed the jury that the duty to warn does not extend to those dangers which are or should be obvious. The jury may have considered that a person should be aware that one should watch his or her step when approaching an elevator, which has moving parts.
The parties provided conflicting evidence as to the credibility of the witnesses. Considering the discrepancies and conflicting testimony, reasonable jurors could find that Otis was not negligent; that Otis did not have custody, control or "garde" so as not to be strictly liable for Mrs. Rabito's injuries; and that the utility of the elevator outweighed its potential danger under a theory of products liability. The trial court erred in granting a judgment notwithstanding the verdict. A finding of lack of liability on Otis' part pretermits a review of the other issues raised by Otis.
Plaintiffs argue that they are entitled to a new trial if the judgment notwithstanding the verdict is overturned under LSA-C.C.P. art. 1811 C because the trial judge found that the jury verdict was contradictory, *377 contrary to the law or the evidence, and "shocks the conscience." The trial court declined to grant a new trial because adequate evidence was presented for a fair consideration of the facts by the jury. We agree.
Further, the jury's answers to the interrogatories are conclusive that Otis was not liable. The jury did not find a defect in the elevator or negligence on the part of the defendants but concluded that the Medical Center had custody of the elevator and was 75 percent at fault. The jury found that the plaintiff was 25 percent at fault. The jury may have thought it was unnecessary to prove that the elevator was defective from the trial court's jury instruction regarding strict liability which stated that, "It is not necessary that any negligence or knowledge of the defective condition be proved, nor is the person responsible for the thing relieved from liability simply because the defect could not be easily detected." The trial court further stated, "In regard to proof of care or custody, these terms are used to describe the relationship of direction and control or guardianship over a thing, and whether a person draws some kind of benefit from it." Without finding that the elevator was defective, the jury may have considered that although a defect could not be detected, the party who had custody or control over the elevator and who was the primary party benefiting from the elevator, would be strictly liable for the injury incurred in the elevator. By finding that the defendants were not negligent, the jury did not equate negligence with fault when it assigned the percentages of fault to the Medical Center and Mrs. Rabito. Regardless, the jury reasonably did not find that Otis was negligent, at fault or liable.

Quantum
To adjust an amount of damages awarded by a jury on a motion for judgment notwithstanding the verdict, the trial court must conclude that reasonable men could not differ on the fact that the award was abusively high or low. Anderson, supra, 583 So.2d at 833. The discretion vested in the trier of fact is "great", and even vast in determining the amount of damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993); Doe v. McNulty, 630 So.2d 825, 1993 WL 496109 (La.App. 4 Cir.1993), writ denied No. 93-C-3073, 631 So.2d 1167 (La.1994).
The trial court stated that the jury's general damage award "shocks the conscience, considering the extent of injuries that Rose Rabito sustained and the fact that she is left with permanent, severe, intractable pain."
Mrs. Rabito provided discrepancies in her testimony about the extent of her pain and disability. Although she testified that she had no use of her left hand, when Mrs. Rabito was asked about carrying her purse with her left hand, she explained that she could use the tips of her fingers quite nicely. Although there was testimony that she stayed home in bed most of the time, she agreed that she went to a New Year's Eve party at the home of her former employer, Dr. Daniel Buras. Mrs. Rabito did not mention problems with her knees when she was examined by Dr. Felix Rabito on the day of the accident and her left knee symptoms appeared eight months later in January 1989.
Dr. Bruce Razza, an orthopedic surgeon, performed carpal tunnel surgery on Mrs. Rabito's left wrist in February 1989 but severe infection required further surgery in which a catheter tube was placed in the main blood vessel to put special antibiotics directly into Ms. Rabito's bloodstream for six weeks. Dr. Razza opined that usually bacteria introduced during surgery would be manifested as an infection within ten days to two weeks. Initially Ms. Rabito did well and did not develop the infection for several months. Dr. Razza agreed that the plaintiff could have been exposed to shrimp or crabs which could cause the infection during the three months after Mrs. Rabito was out of the hospital. An infection from seafood would show up in the most vulnerable area when healing was taking place. Noting that Mrs. Rabito suffered from carpal tunnel syndrome which had cleared up prior to the accident, Dr. Razza opined that the accident could have aggravated her preexisting condition. Dr. Razza also agreed that carpal tunnel syndrome could develop spontaneously at *378 any time as a cumulative effect of repetitive action.
Dr. Joe Almond Morgan, an orthopedic surgeon who performed surgery on Mrs. Rabito's right hand in January 1990, opined that Mrs. Rabito's carpal tunnel syndrome and achilles tendonitis probably were related to the accident although arthritis in the knees and thumbs were not related to the accident. He also removed a portion of torn cartilage of the medial meniscus of Mrs. Rabito's left knee, which he stated probably was related to the accident. Dr. Morgan agreed that the knee injury would be manifested within two to three weeks if related to the elevator accident, but did not appear until three to six months later. Dr. Morgan did not think that the ruptured tendon was related to the accident but was first noticed in September 1991. Dr. Morgan assigned 100 percent permanent partial disability to Mrs. Rabito's left wrist, ten or five percent permanent partial disability to the left knee, and five percent disability to the lower extremities from the achilles tendons. Dr. Morgan agreed that pain in the achilles tendons could come and go and could be unrelated to the elevator accident.
Dr. Harold Stokes, an orthopedic surgeon, testified that Mrs. Rabito suffered severe, chronic pain and assigned 100 percent disability Mrs. Rabito's left hand although Dr. Stokes stated that the sensitive area of Ms. Rabito's left hand had been reduced to the size of between a quarter and a half dollar. Dr. Stokes removed scar tissue in plaintiff's wrist in two surgeries performed on the left median nerve in the left hand. He noted that Mrs. Rabito had an uncommon condition of causalgia which caused severe intolerable pain. Dr. Stokes agreed that the infection to plaintiff's left wrist was exceedingly rare as a complication to surgery, and the typical way to get Mrs. Rabito's particular infection was for patients to stick themselves with crawfish or crab claws. Dr. Stokes recommended additional surgery to alleviate the pain in the Mrs. Rabito's left hand.
Evidence was presented from which the jury could conclude that the amount of Mrs. Rabito's damages was limited to $174,917 and Mr. Rabito's damages equaled $10,000. The amount of damages awarded by the jury against the Medical Center was reasonable and proper in light of the conflicting medical testimony. The trial court erred in finding that reasonable men could not differ on the fact that the jury award was abusively low.

Highlands
Highlands, the worker's compensation carrier, submits that the trial court erred in awarding $24,052.76 to the plaintiffs to be paid by Highlands for total reimbursement of out-of-pocket costs incurred by the plaintiffs.[2] Highlands argues that it should be responsible only for its proportionate share or $2,645.80, representing 11 percent of the total costs of $24,052.76.
An employer's proportionate interest in the recovery is equivalent to the ratio or percentage that the amount of compensation paid or due at the time of recovery bears to the total recovery. Moody v. Arabie, 498 So.2d 1081, 1086 (La.1986). Highlands argues that the proper formula is:
Employer's Reimbursement = Employer's Share
 Total Recovery of Recovery
Highlands designated the numerator to be $142,556.92 as the employer's reimbursement and the denominator for total recovery to be $1,266,229.40 based on the trial court's total award of $1,026,240 on judgment NOV plus the settlement of $240,000 with the Medical Center as follows:
 $ 142,556.92 = 11%
 ------------------------
 $1,266,229.40
 ($1,026,249 + $240,000)
We reject Highlands' figures because elsewhere in the opinion we have overturned the trial court's award on judgment NOV in the amount of $1,026,240.
Plaintiffs counter that the proper formula for determining the employer's proportionate share of costs includes a calculation of future compensation and medical expenses in proportion to the total recovery. Plaintiffs assert that if the employer or its *379 insurer is relieved of future liability for compensation, the amount of the future liability should be added to the calculation. Moody, supra, 498 So.2d at 1087; Taylor v. Production Services, 600 So.2d 63 (La.1992). We agree with the plaintiffs.
Next, we must determine what figures to use in the equation. Plaintiffs argue that the "recovery from the third person" should be based on the $240,000 settlement with the Medical Center, resulting in the following equation:
 Employer's reimbursement + future compensation + future medical = %
-------------------------------------------------------------------
 Recovery from third person
Based on the plaintiffs' argument, $142,559.93 represents the amount of the employer's reimbursement; $113,829.95 represents the trial court's award on judgment NOV for the present value of future worker's compensation benefits and $25,000 represents the trial court's award on judgment NOV for the present value of future medical expenses. The total of those three figures is $281,386.22 which is divided by $240,000, which is the amount recovered in settlement with the Medical Center, and the result is 117 percent.[3] The employer's insurer, Highlands, may be liable for up to 100 percent of plaintiffs' costs. As the above formula results in a figure in excess of 100 percent (117 percent), plaintiffs claim the trial court correctly assessed 100 percent of the plaintiffs' costs to the intervenor, Highlands.[4]
Considering that the trial court's award on judgment NOV has been reversed and the original jury verdict has been upheld, Otis is not liable. Therefore, the total amount of recovery from the third party (Medical Center) and the total amount of recovery is the same, i.e., $240,000, based on the settlement (which is more than the total jury award of $184,917[5] against the Medical Center).
We have no way of determining exactly what the component parts of a lump sum settlement are. Therefore, we must devise a method for making our best estimate. In this case the best approach would be to adopt the same proportions adopted by the jury even though the total recovery amount is different.
To determine the proportion of the future compensation, the jury's award for loss of future earnings and future earning capacity, $20,000, is proportioned over $174,917 which is the total jury award to Mrs. Rabito.[6] The proportion for future compensation is as follows:
$20,000 (jury's award for future earnings) = 11 percent
--------------------------------------------
$174,917 (jury's total award to Mrs. Rabito)
Applying this proportion to the settlement/total recovery amount, the amount of *380 future compensation would be 11 percent of $240,000 or $26,400.
To determine the proportion of the future medical expenses, the jury's award for future medical expenses, $20,917, is proportioned over $174,917 which is the amount of the total jury award to Mrs. Rabito. The proportion for future medical is as follows:
$20,917 (jury's award for future medical) = 12 percent
--------------------------------------------
$174,917 (jury's total award to Mrs. Rabito)
Applying this proportion to the settlement/total recovery amount, the amount of future medical expenses would be 12 percent of $240,000 or $28,800.
The proper formula is as follows:
$142,556.93[7] + $26,400[8] + $20,917[9] = $189,873.93 = 79%
---------------------------------- -----------
$240,000[10] $240,000
Applying 79 percent of $24,052.76, which is the total cost related to the prosecution of plaintiffs' claim, Highlands should pay Mrs. Rabito $19,001.68 as the insurer/intervenor's proportionate share of the cost of litigation.
Accordingly, the judgment of the trial court is reversed and the judgment of February 7, 1992, dismissing the plaintiffs' claims against Otis is reinstated based on a proper jury verdict. Mrs. Rabito is awarded $19,001.68 against Highlands for the insurer/intervenor's proportionate share of the cost of litigation.
REVERSED & RENDERED.
NOTES
[1] The jury reached a verdict pursuant to written interrogatories which it answered as follows:

1) Was Rose Rabito injured as a result of a defect in an elevator in the Medical Center of East New Orleans on April 13, 1988?
 YES _______ NO X 
2a) Was the elevator in the care, custody and control of the Otis Elevator Company on April 13, 1988?
 YES _______ NO X 
2b) Was the elevator in the care, custody and control of the Medical Center of East New Orleans on April 13, 1988?
 YES X NO _______
3) Do you find that Otis Elevator was negligent in the manner claimed?
 YES _______ NO X 
(If you answered "no", proceed to question 5: if you answered "yes", proceed to question #4)
4) Was the negligence of Otis a legal cause of the injury and damages claimed?
 YES _______ NO _______
(Proceed to # 5)
5) Do you find that the Medical Center of East New Orleans was negligent in the manner claimed?
 YES _______ NO X 
(If you answered "yes", proceed to #6; if you answered "no", proceed to *INSTRUCTIONS)
6) Was the negligence of the Medical Center of East New Orleans a legal cause of the injury and damage claimed?
 YES _______ NO _______
*INSTRUCTIONS:
If you answered any of the above questions "yes", please proceed to # 7. If you answered "no" to all of the above questions, please have the Foreperson sign the bottom of this form, date it and notify the Court.
7) Was Rose Rabito negligent?
 YES X NO _______
(If you answered "Yes, proceed to # 8; if you answered "no", proceed to # 9)
8) Was her negligence a legal cause of her injuries?
 YES X NO _______
(Proceed to # 9)
9) State the percentage of fault for each of the parties whose fault you found to have caused injury to Rose Rabito.

Otis Elevator 0 %
 _______
Medical Center of East New Orleans 75 %
 _______
Rose Rabito 25 %
 _______
 TOTAL 100 %
 _______

(Proceed to question #10)
10) What sum of money do you find will fully and adequately compensate Rose Rabito for lack of the following elements of damages?
NOTE: You should NOT adjust or reduce this award by any percentage you may have given in answer to # 9 above; the Court will make any necessary adjustments:
a) past and future pain and suffering, both physical and mental; permanent disability, and past and future loss of enjoyment of life

 $ 26,083.
 __________
b) loss of past earnings
 $ 45,000.
 __________
c) loss of future earnings and future earning capacity
 $ 20,000.
 __________
d) past medical expenses
 $ 62,917.
 __________
e) future medical expenses
 $ 20,917.
 __________
 TOTAL $174,917
 __________

(Proceed to #11)
11) Do you find Anthony Rabito experienced a loss of consortium as a result of the injuries sustained by his wife, Rose Rabito?
 YES X NO _______
(If you answered "yes", proceed to # 12. If you answered "no", sign form and inform the Court.)
12) What sum of money compensates Anthony Rabito for his loss of consortium as a result of the injuries sustained by his wife, Rose Rabito?
 $ 10,000
 _________
Now foreperson should sign and date this document, then notify the Court.
/s/ Patricia Strickland 2/4/92
FOREPERSON DATE

[2] Plaintiffs and Highlands agreed on the amount of attorney's fees based on the settlement of $240,000 received from the Medical Center, and the parties only dispute the trial court's calculation of the apportionment of costs.
[3] $142,556.93 + $113,829.95 + $25,000 = $281,386.88 = 117%
 ----------------------------------- -----------
 $240,000 $240,000

[4] Subsequent to Moody v. Arabie, supra, Act 454, Sec 4 of 1989, effective January 1, 1990, amended LSA-R.S. 23:1103 to provide, in pertinent part, as follows:

C. If either the employer or employee intervenes in the third party suit filed by the other, the intervenor shall only be responsible for reasonable legal fees and costs incurred by the attorney retained by the plaintiff. Such reasonable legal fees shall not exceed one third of the intervenor's recovery for pre-judgment payments or pre-judgment damages.
The amendment to LSA-R.S. 23:1103 is not retroactive and does not apply to a claimant's action involving a work-related accident which occurred before the effective date of the amendment. St. Paul Fire & Marine Ins. Co. v. Smith, 609 So.2d 809 (La.1992); Taylor, supra. Mrs. Rabito's accident occurred in 1987 when Moody was the applicable law.
[5] This figure includes $174,917 awarded to Mrs. Rabito plus $10,000 awarded to Mr. Rabito for loss of consortium.
[6] Considering that Highlands' portion of litigation costs is based on recovery of compensation and medical payments made to the insured's employee, Mrs. Rabito, this figure only includes the total amount awarded by the jury to Mrs. Rabito, and it excludes the $10,000 amount awarded by the jury to Mr. Rabito for loss of consortium.
[7] Employer's reimbursement.
[8] Proportionate share of future compensation as determined by the jury.
[9] Proportionate share of future medical expenses as determined by the jury.
[10] Total recovery/settlement amount.